# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | | |
|---|---|---|
| **ZIEHM IMAGING, INC.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 7:07-cv-195 (HL) |
| | : | |
| **CHARLIE J. HOES and SURGICAL** | : | |
| **CONNECTIONS, INC.,** | : | |
| | : | |
| Defendants. | : | |

## ORDER

Currently before the Court is Plaintiff Ziehm Imaging, Inc.'s ("Ziehm") Motion for Partial Summary Judgment.  Ziehm is seeking judgment in its favor on two breach of contract counts and on Defendants Charlie J. Hoes and Surgical Connections, Inc.'s counterclaims against it.  Defendants have responded to the motion, and contend that summary judgment is not warranted.  The Court, after considering the parties' briefs and the applicable law, grants in part, and denies in part, Ziehm's motion.

## I.    FACTS

Ziehm manufactures and sells C-arm radiation machines and related equipment.  C-arms, which are named for the shape, are medical imaging machines.  Ziehm utilizes a network of independent distributors to sell its equipment throughout

the United States.  It also hires Regional Sales Managers ("RSMs") to work with the independent distributors to facilitate the sales and service of Ziehm equipment.

Defendant Surgical Connections, Inc. ("Surgical Connections"), which is wholly owned by Defendant Charlie Hoes ("Hoes"), is a company that sells medical products for use in operating rooms, including wheelchairs, operating room tables, and sterilizers.   Surgical Connections also sells C-arms, and began selling refurbished C-arms manufactured by GE/OEC, Phillips, and Siemens in 2001.

On September 8, 2004, Surgical Connections entered into a Manufacturer Representative Agreement with Ziehm to become a Ziehm distributor.  Surgical Connections pledged to "use its best efforts to actively promote and sell" Ziehm products for the term of the agreement, and also agreed that it would "not [ ] sell, distribute or otherwise assist in the marketing of any other competitive product which is of similar make, design or purpose."  (Doc. 32-6, p.3).  Surgical Connections sold new Ziehm C-arms in 2004, and has never sold new C-arms other than those manufactured by Ziehm.

Under its terms, the Manufacturer Representative Agreement was to be effective for a period of two years.  Thereafter, it was to automatically renew for another two years unless either party terminated the agreement with a 30-day written notice.  Ziehm also had the right to terminate the agreement with a 30-day written notice if Surgical Connections did not perform under the agreement.

2

On December 6, 2004, Hoes applied for an RSM position with Ziehm.  On his application, Hoes reported that he had worked for Surgical Connections from 1998 until December of 2004.  In the box labeled "State Job Title and Describe Your Work," Hoes wrote "RSM - Sales, Manage Reps."  He also indicated that he had been paid on commission only and was leaving Surgical Connections for "RSM Ziehm."[1]  Hoes also provided Ziehm with a copy of his resume, on which he stated that he was responsible for "working with Reps in the field; hiring and firing" while with Surgical Connections.  Hoes, however, was Surgical Connections' only sales representative prior to December 2004.[2]

During the application process, Hoes disclosed to Eric Klawitter, Ziehm's CEO at the time, and Wynelle (last name unknown) that he owned Surgical Connections.  He also told them about the type of work done by Surgical Connections.  Hoes did not discuss this information with Wolfram Klawitter, who interviewed Hoes for the

---

[1]Defendants contend that Ziehm's Statement of Material Fact 10 is speculative and calls for the interpretation of specific terms of the job application.  Ziehm's Statement 10 reads as follows:  "On his written application, Hoes reported that he had worked for [Surgical Connections] from 1998 until December 2004, that he had been paid by commission only, and that that [sic] he had been an 'RSM' (regional sales manager), responsible for sales and for managing representatives."  Upon review of the application, the Court finds no other way to read the information provided by Hoes.  There certainly is no question that the abbreviation "RSM" used by Hoes five different times in the application stood for "regional sales manager."  In any event, the contents of the job application do not factor into the Court's decision.

[2]Hoes did directly manage at least one Surgical Connections employee, and was responsible for the eventual termination of her employment.  This occurred, however, after Hoes was terminated by Ziehm in April of 2007.

RSM position.[3]   Hoes also never told Ziehm that Surgical Connections sold refurbished C-arms made by other manufacturers or that he was selling medical equipment through Surgical Connections.

It was Hoes' understanding that the Manufacturer Representative Agreement between Ziehm and Surgical Connections ended once he became employed as an RSM.   After Hoes started working for Ziehm in January of 2005, Surgical Connections leased and continued to sell refurbished C-arms to the medical community.   It is undisputed that Hoes continued to work for Surgical Connections after starting his job with Ziehm.

While employed by Ziehm, Hoes was reimbursed for mileage and other travel expenses.   On at least one occasion, Hoes reported mileage on Surgical Connections' expense statement for income tax purposes that he also submitted to Ziehm for reimbursement.   Hoes also used Ziehm sales calls to discuss potential Surgical Connections sales, and probably received calls for Surgical Connections on the cell phone Ziehm provided, though he tried to keep the two businesses as separate as possible.

On December 3, 2005, Hoes entered into a Compensation and Bonus Plan for Regional Sales Managers (the "RSM Agreement") with Ziehm.   Under the RSM Agreement, Hoes agreed that while he was employed by Ziehm, he would not

---

[3]Wolfram Klawitter served as Ziehm's CEO prior to his son, Eric Klawitter.

engage in any other occupation or distribute or sell any product or service other than the line regularly distributed by Ziehm.

The RSM Agreement contained the specifications for Hoes' compensation as a Ziehm RSM, which included a base salary and potential bonus payments if certain sales numbers were met.  It did not provide a commission-based payment structure. Hoes did not receive a new RSM Agreement for 2006 or 2007.[4]

While the parties have not located any document officially changing the salary and bonus structure to a commission-based structure, on July 16, 2007, Andrew J. Boyd, Ziehm's human resources manager, requested a check made payable to Hoes for "Commission Due From Quarter 1 - 2007."  The check request also contains the notation "Period (Commission) 01/01/07-03/31/07."  Ziehm also prepared a "Sales Commission" table for Hoes dated July 31, 2007, which shows a total commission earned of $15,971.92 for the first quarter of 2007.[5]

In October of 2006, Ziehm issued a Code of Conduct, which, according to Ziehm, was created because of concerns about Hoes' behavior.  Hoes signed the document, certifying that he knew of no potential or existing conflict of interest with

---

[4]The parties believe the 2005 RSM Agreement covered the year 2006.

[5]Another document concerning the payment of commissions is attached to Defendants' Response as Exhibit D.  This email, apparently produced from the email inbox of Andrew Boyd and dated August 7, 2007, is from Brian Collins with CMS Imaging, presumably to Ziehm.  In the email, Mr. Collins refers to a guarantee of a 10% payment for C-arm deals he worked on with Hoes, and requests payment on certain orders because "we spent time selling these systems under the presumption we would be getting the 10% as promised."  (Doc. 51-6).

Ziehm. He also agreed that he would immediately notify the CEO if a potential conflict of interest arose. (Doc. 32-12). Conflict of interest was not specifically defined in the document. During 2006, Hoes received two written notices of disciplinary action, and was ultimately terminated from his position as an RSM in April of 2007.

Between July of 2005 and March of 2007, Surgical Connections sold at least sixteen C-arms to various medical providers. Between March of 2006 and April of 2007, Surgical Connections rented or leased at least five C-arms to various medical providers. Hoes was employed by Ziehm during these time periods, and he conducted these transactions for the benefit of Surgical Connections, not Ziehm. By the Court's calculation, the sales totaled well over $600,000.

Hoes received compensation from Ziehm in the amounts of $71,380.40 in 2005, $119,417 in 2006, and $55,840 in 2007, for a total of $246,637.40.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it

6

believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  That burden is "discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.

Once the movant has met this burden, the opposing party must present evidence establishing that there is a genuine issue of material fact. <u>Id.</u>  In order to defeat summary judgment, the nonmoving party must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  <i>See</i> <u>id.</u> at 322, 324.

A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-250 (internal citations omitted). It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. <u>Id.</u> at 249. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id.</u> at 255.

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir.1991)

7

(citation omitted), *cert. denied*, 506 U.S. 952, 113 S.Ct. 405 (1992).  The evidence "cannot consist of conclusory allegations or legal conclusions." Id. (citation omitted). Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  *See* Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir.1984).

## III.   CONCLUSIONS OF LAW

### A.   Ziehm's Breach of Contract Claims

Ziehm has moved for summary judgment in its favor on the issues of (1) Hoes' breach of the RSM Agreement (Count II of the Amended Complaint) and (2) Hoes' breach of the Code of Conduct (Count I of the Amended Complaint).  Ziehm also believes it is entitled to summary judgment on the issue of damages arising out of these alleged breaches of contract.

Section V of the RSM Agreement, entitled "Exclusion of Other Work," reads as follows:

> While employed by the Company, RSM's agree not to engage in any other occupation and, in particular, not to represent, distribute or sell any product or service of any nature, other than the line regularly distributed by Ziehm II, at any time to the medical profession or to any other group.

(Doc. 32-10).

Ziehm contends that Hoes breached this provision because he engaged in another occupation by continuing to work for Surgical Connections while employed

8

by Ziehm, and because he sold medical equipment other than that regularly distributed by Ziehm.

The Code of Conduct provides that:

> While employed by the Company, employees agree not to engage in any behavior, other occupations, affiliations including direct competition, or other activities that would be in direct competition with Ziehm Imaging, Inc. Such behaviors, occupations, or other activities could include but are not limited to actions or affiliations that negatively impact, could negatively impact, or have the appearance of negatively impacting and/or impeding the Company in achieving its goals....The CEO has the responsibility of determining what is potentially a conflict of interest and what code of conduct expectations will be set for the Company. Any and all conflicts of interest, or potential conflicts of interest, must be communicated by the employee to the CEO at the time of discovery and/or prior to incident. Failure to disclose any and all conflicts and/or potential conflicts prior to the Company discovering and/or incident could lead to disciplinary action up to and including termination of employment.

(Doc. 32-12).

When he signed the Code of Conduct, Hoes certified that he knew of "no potential and/or existing conflict of interest between myself and Ziehm Imaging, Inc.," and promised that "when/if should a conflict of interest arise, [ ] I will immediately notify the CEO. I understand that failure to do so could result in the termination of my employment." (Doc. 32-12).

Ziehm contends that Hoes violated the Code of Conduct by failing to communicate with the CEO about a potential conflict of interest between his conduct with Surgical Connections and his employment as a Ziehm RSM.

Before addressing the merits of Ziehm's arguments, the Court must first address two arguments made by Defendants in their response.  Defendants first contend that the Exclusion of Other Work provision in the RSM Agreement and the Code of Conduct  conflict with each other and contain ambiguous terms.  While it is not clear from their response, the Court believes Defendants are arguing that summary judgment is not proper because parol evidence should be allowed to explain the contradiction between the documents and remove the ambiguity.

The difference between the case before the Court and the case cited by Defendants in their response as support for their position, Cable Co. v. McFeeley, 7 Ga.App. 435, 66 S.E. 1103 (1910), is that in Cable Co., the contract was embodied in two writings which were executed simultaneously as part of the same transaction. The contradiction between terms in the two writings, which were a note and a receipt, was effectively a contradiction between terms in the same contract.  Thus, it was proper to admit parol evidence to explain the contradiction and remove the apparent ambiguity.  Here, however, the RSM Agreement and Code of Conduct were not executed simultaneously.  In fact, they were executed some ten months apart. Nothing in the record, including Hoes' affidavit, suggests that the parties considered the RSM Agreement and Code of Conduct to be one contract.  Neither document

10

purports to be the entire agreement between the parties, and neither agreement contains a merger clause.  If the Code of Conduct contained such a clause, it would at least be arguable that the Exclusion of Other Work provision was subsumed by the Code of Conduct, but it does not.  Thus, the Court must examine each document as a separate contract for which a breach may be found.

The second argument advanced by Defendants is that summary judgment is inappropriate because the restrictive covenants contained in the RSM Agreement and Code of Conduct are unreasonably overbroad.  The general rule is that covenants against competition in employment agreements are upheld only when strictly limited, both in time and geographical effect, and when the restrictions are otherwise reasonable.  Sanford v. RDA Consultants, Ltd., 244 Ga.App. 308, 535 S.E.2d 321 (2000).  Defendants contend that the contract provisions are invalid because they do not contain a duration period, do not contain a geographical limitation, and improperly restrict Hoes from engaging in any activities connected in any way with a business similar to Ziehm's.

A simple reading of the covenants, however, shows that they are for a limited duration.  The covenants are effective only while the employee is "employed by the Company."  They do not contain any post-employment restrictions, so presumably an employee could begin competing with Ziehm the minute he is no longer employed by that company.

While no geographic limitation is contained in the covenants, this case does not involve post-termination restrictions on employment, which would require a geographical limitation.  Instead, this case involves covenants which restrict the employee from engaging in a competing business during the term of employment. "The validity of such covenant cannot be questioned so long as the employee remains in the employ of the employer." Saul v. Thalis, 156 F.Supp. 408, 411 (D.C. 1957);  see also A. Hollander & Son v. Imperial Fur Blending Corp., 66 A.2d 319, 325 (N.J. 1949) ("The covenants...in the employment contract ...not to engage in other business during the term of employment, are clearly reasonable demands which the employer may exact from his employee.").  If Hoes was prohibited under the contracts from competing with Ziehm for an indeterminate time and in an undetermined area after his employment ended, the argument that the covenants are invalid would hold more weight. But those are not the facts in this case.  Hoes' right to earn a living was not burdened because he was being paid by Ziehm during his employment and he could compete all he wanted after his employment with Ziehm ended.   It is not unreasonable for Ziehm not to want its RSMs to engage in competing business while they are supposed to be selling Ziehm products.  The Exclusion of Other Work provision in the RSM Agreement and the Code of Conduct are not unenforceable restrictive covenants.

### 1.    Did Hoes breach the RSM Agreement as a matter of law?

There is no real dispute that Hoes continued to work for Surgical Connections after signing the RSM Agreement.  In fact, when asked if he stopped working for Surgical Connections, Hoes testified, "No.  I think that we both know that I didn't do that." (Deposition of Charlie J. Hoes, Vol. 2, p. 278).  As the Court has determined that the RSM Agreement is an independent contract that does not contain an overbroad restrictive covenant, Defendants' only remaining argument is that the Exclusion of Other Work provision is ambiguous.

The construction of a contract is a question of law for the court.  O.C.G.A. § 13-2-1.  A trial court must engage in a three-step analysis in construing a contract: "first, the court must decide if the contract language is unambiguous, and, if so, the court enforces the contract's clear terms; second, if the contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity; and third, if the ambiguity remains after use of the construction rules, the meaning of the contract must be decided by a jury." Sheridan v. Crown Capital Corp., 251 Ga.App. 314, 315-316, 554 S.E.2d 296 (2001).

"Ambiguity exists when a contract is uncertain of meaning, duplicitous, and indistinct; or when a word or phrase may be fairly understood in more than one way, such constitutes ambiguity." Id. at 315.  The Court finds no ambiguity in the terms contained in the Exclusion of Other Work provision.  On the contrary, the words are plain and clear.  Ziehm RSMs were prohibited from engaging in any other occupation

13

while employed by Ziehm.  They were also prohibited from selling any product other than the Ziehm line of products to members of the medical profession during their employment.[6]  Defendants do not point to any specific ambiguities in the Exclusion of Other Work provision, reinforcing the Court's finding.

"[W]here the language of a contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the trial court." Ainsworth v. Perreault, 254 Ga.App. 470, 476, 563 S.E.2d 135 (2002) (quoting Estate of Sam Farkas, Inc. v. Clark, 238 Ga.App. 115, 119-120(2), 517 S.E.2d 826 (1999)).  In the absence of any ambiguities, it is unnecessary for the Court to consider steps two and three in the three-step contract construction analysis.  It is now the Court's responsibility to enforce the contract's clear terms.

The Court finds that Hoes breached the RSM Agreement as a matter of law. The evidence is clear that Hoes, through Surgical Connections, sold equipment that was not Ziehm equipment to the medical profession while he was employed by Ziehm.  Documents produced by Defendants show that between Hoes' hiring in December of 2005 and his termination in April of 2007, Defendants sold sixteen C-arms to various medical professionals.  Taking out the transactions where Surgical Connections purchased a used Ziehm C-arm and later re-sold it, because one could

_____

[6]While it may be arguable that the term "any other occupation" is somewhat ambiguous, the Court's ruling is based on the prohibition against selling non-Ziehm products during the term of employment, which is unambiguous.

14

at least argue that these sales did not violate the Exclusion of Other Work provision, Hoes and Surgical Connections sold ten non-Ziehm products to members of the medical community.  This is a clear violation of the RSM Agreement.  Ziehm is entitled to summary judgment on Count II of the Amended Complaint.

### 2.  Did Hoes breach the Code of Conduct as a matter of law?

Having determined that Hoes breached the RSM Agreement as a matter of law, it is not necessary to address Ziehm's claim that Hoes breached the Code of Conduct.

### 3.  Is Hoes required to return all compensation to Ziehm as a matter of law?

Ziehm contends that it is entitled to a refund of all the compensation it paid Hoes during his employment with the company, a total of $247,537.52 for purposes of the motion.  This is based on principles of agency law.  According to Ziehm, Hoes was an agent of the company, as he was authorized to solicit offers, offer quotations, provide contracts, and hire and fire distributors.  Hoes, not surprisingly, argues that he was not an agent of Ziehm, as he did not have the authority to bind Ziehm to contracts, hire or fire employees, or sign checks on behalf of Ziehm.  In his affidavit submitted to the Court, Hoes testified as follows:

> During my employment as a Regional Sales Manager of Ziehm, I have solicited offers from various customers of Ziehm for the purchase of Ziehm products.  At no time did I ever have authority to bind Ziehm into a sale or agreement.  In fact, all quotes or offers had to be put in writing and forwarded to Ziehm corporate or either the

15

> chief executive officer or the national sales manager for
> approval.

(Doc. 51-3).

Ziehm's claim is based on the principle that an agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty. *See* RESTATEMENT (SECOND) OF AGENCY, § 469 (1957). Under Georgia law, "[a]n agent who shall have discharged his duty shall be entitled to his commission and all necessary expenses incurred about the business of his principal. If he shall have violated his engagement, he shall be entitled to no commission." O.C.G.A. § 10-6-31.

In order for Ziehm to prevail on its damages claim, it must first establish that Hoes was Ziehm's agent. "The distinguishing characteristic of an agent is that he is vested with authority, real or ostensible, to create obligations on behalf of his principal, bringing third parties into contractual relations with him." Stallings v. Sylvania Ford-Mercury, 242 Ga.App. 731, 732(1), 533 S.E.2d 731 (2000) (citations and punctuation omitted). In order to serve as Ziehm's agent, Hoes "had to be more than the employee delegated by [Ziehm] to look after certain accounts...." Atlanta Market Ctr. Mgmt. Co. v. McLane, 269 Ga. 604, 606, 503 S.E.2d 278 (1998).

Hoes has testified through his affidavit that he could not create obligations on behalf of Ziehm without the company's approval, and in effect was not an agent. Hoes' claim that he had to obtain approval for any offers or quotes is supported by

a series of emails provided by Ziehm as part of its reply brief.  (Doc. 57-2).  It appears that Hoes offered a 25% discount on equipment to a potential customer, but rather than being able to close the deal using that figure, Hoes had to get an official quote from Ziehm.  In the email exchange, after asking for a quote reflecting the 25% discount, Hoes was informed, "[Y]ou will have to present the 18% discount to this account."  The emails lend credence to Hoes' contention that he could not bind Ziehm without its approval.[7]

"It has long been the Georgia rule that one who is a party to the [alleged] relationship (the principal or agent) may testify as a fact as to the existence or non-existence of the relationship and that such testimony would not be subject to the objection that the statement was a conclusion or the ultimate fact."  Salters v. Pugmire Lincoln-Mercury, 124 Ga.App. 414, 415, 184 S.E.2d 56 (1971).  "Since an '"assertion or denial of the existence of an agency relationship is a statement of fact when made by one of the purported parties,"' such a statement may not be disregarded by the trial court.  Lewis v. Citizens Etc. Nat. Bank, 139 Ga.App. 855, 860, 229 S.E.2d 765."  Nat. Prop. Owners Ins. Co. v. Wells, 166 Ga.App. 281(2), 304 S.E.2d 458 (1983).

-----

[7]Hoes' situation is similar to that in Atlanta Market Center Management Co., 269 Ga. at 606, where the Georgia Supreme Court held that a leasing director failed to establish an agency relationship where she testified in her deposition that any leasing arrangement she might suggest had to meet with the employer's approval before the employer signed it.

17

The Court must consider Hoes' denial of an agency relationship a statement of fact.[8]   Ziehm, however, has produced evidence showing the existence of an agency relationship, including testimony that part of Hoes' job was to solicit business on behalf of Ziehm and to hire and fire distributors.  A genuine issue of material fact remains as to whether Hoes was an agent of Ziehm.

As the existence or non-existence of an agency relationship must first be decided by a jury, the Court cannot find at this time that Ziehm is entitled to a refund of the compensation previously paid Hoes.  Ziehm's Motion for Partial Summary Judgment on the damages issue is denied.

## B.   Defendants' Counterclaims

Ziehm has also moved for summary judgment in its favor on all counts of the Defendants' Counterclaims, stating that it has no liability to Defendants.

### 1.   Breach of contract and promissory estoppel

Defendants have counterclaimed against Ziehm for breach of contract and promissory estoppel relating to the payment of commissions.  The breach of contract claim relates to Ziehm's failure to pay approximately $82,000 in commissions earned by Hoes during the first quarter of 2007.  According to Defendants, Ziehm breached

---

[8]While the specific facts of a case may render a statement about the existence or non-existence of an agency relationship a mere conclusion, the evidence presented here, in particular the emails where Hoes sought approval for a quotation, provide at least some support for Hoes' assertion that there was no agency relationship.  *See* Physician Specialists in Anesthesia, P.C. v. Wildmon, 238 Ga.App. 730, 733, 521 S.E.2d 358 (1999); Great Southern Accident & Fid. Co. v. Guthrie, 13 Ga.App. 288, 79 S.E. 162 (1913).

the RSM Agreement by failing to pay these commissions as it had previously done during its course of business with Hoes.

No commission-based payment structure is set out in the RSM Agreement. There is a bonus system, where set payments are made when recorded sales are equal to or greater than a certain percentage of the annual sales quota for a given quarter.  The RSM Agreement contains two references to commissions, as Section A(2)(a) and (b) both state that "[n]o commission and/or Bonus shall be paid" on certain services and charges and sales.  (Doc. 32-10).

Neither party has produced any evidence of a written agreement under which Hoes was to be paid commissions.  Hoes admitted in his deposition that he did not receive new employment contracts for 2006 and 2007, and this is not contradicted by his affidavit.  This means that the only written compensation contract between Hoes and Ziehm before the Court is the 2005 RSM Agreement.

Nonetheless, the Court cannot ignore the documentation provided by Defendants which shows that Hoes was paid a 3% commission on four sales made during the first quarter of 2007, for a total commission earned of $15,971.92.  This information is contained on a Ziehm document entitled "Sales Commission," and Ziehm's own human resources director requested a check payable to Hoes for commissions due from the first quarter of 2007.

The remaining $82,000 in commissions Hoes claims is due is also from the first quarter of 2007.  For whatever reason, Ziehm paid a 3% commission to Hoes

for sales made in the first quarter.  Thus, the real disagreement is whether Hoes only earned a total commission of $15,971.92, as paid by Ziehm, or a total commission of $102,000, as Hoes claims.  While Ziehm contends that the "commission" payment was nothing more than a discretionary payment made on one occasion to Hoes, Ziehm did in fact voluntarily make a payment to Hoes based on a percentage of the sales he made for Ziehm.  For at least the first quarter of 2007, Ziehm authorized commission-based payments for Hoes as a Ziehm RSM.  Defendants should be afforded the opportunity to present evidence to a jury that Hoes is entitled to additional commissions for the first quarter of 2007 based on the previously made 3% commission payments.  The Court denies Ziehm's Motion for Partial Summary Judgment on Count I of Defendants' Counterclaim.

As for the promissory estoppel claim, Count II of Defendants' Counterclaim, the Court agrees with Ziehm that summary judgment in Ziehm's favor is warranted.  The essential elements of promissory estoppel are:  (1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiff to rely on such a promise; (3) the plaintiff relied on such promise to his detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, the plaintiff changed his position to his detriment by surrendering, forgoing, or rendering a valuable right.  Herndon Props., LLC v. Cinema Dev., LLC, 275 Ga.App. 434, 620 S.E.2d 644 (2005).  In order to survive summary judgment, Defendants were required to present evidence from which a jury

could infer that Hoes relied on Ziehm's purported promise to pay commissions to his detriment, and that injustice would be avoided only by enforcing Ziehm's promise. *See* Ambrose v. Sheppard, 241 Ga.App. 835, 528 S.E.2d 282 (2000). Defendants have not done so. Without some evidence of reliance on the part of Hoes, the matter cannot go to the jury. Ziehm's Motion for Partial Summary Judgment on Count II of Defendants' Counterclaim is granted.

### 2. Unjust enrichment

Count III of Defendants' Counterclaim is for unjust enrichment. Ziehm moves for summary judgment on this count, arguing that because the law of unjust enrichment applies only when there is no express contract between the parties, this claim fails as a matter of law because of the existence of the RSM Agreement. The Court finds that Defendants' claim cannot succeed for another reason.

Under Georgia law, an unjust enrichment claim requires the plaintiff to establish: (1) that the plaintiff conferred a benefit on the defendant; and (2) that equity requires the defendant to compensate the plaintiff for this benefit. Engram v. Engram, 265 Ga. 804, 463 S.E.2d 12 (1995). Unfortunately for Defendants, they have not met the first prong of this test, as Defendants have not presented any evidence that Hoes conferred a benefit upon Ziehm, or that Ziehm took benefits, for which Hoes has not been compensated. Defendants do not even address the unjust enrichment claim in their response, other than making a conclusory statement that genuine issues of material fact exist. Defendants' Counterclaim is similarly vague,

21

as it states that Hoes conferred a benefit on Ziehm for which Hoes has not been

compensated, but at no time is the alleged benefit ever identified.  The Court can

assume that the alleged benefit was the sale of medical equipment, but that was

Hoes' job, for which he was admittedly paid a salary and some commissions in

2007.  Hoes has not shown that he engaged in any extra work performed outside the

scope of his expected job duties, or that Ziehm was unjustly enriched as a result of

his actions.  Without evidence of an alleged benefit to Ziehm, Defendants cannot

succeed on an unjust enrichment claim.  Ziehm is entitled to summary judgment on

Count III of Defendants' Counterclaim.

### 3.    Tortious interference with business relations

According to Defendants, after Hoes was terminated by Ziehm, several

potential Surgical Connections customers informed Hoes that they could not do

business with Defendants.  Defendants contend that Ziehm threatened to terminate

the customers' Ziehm vending licenses if they engaged in business with Hoes or

Surgical Connections.  Virtual Imaging, a company in Florida, is the only potential

customer identified by Defendants as allegedly receiving this warning from Ziehm.

Defendants aver that the loss of potential customers has caused monetary damage.

A claim for tortious interference with business relations requires a showing

that the defendant "(1) acted improperly and without privilege; (2) acted purposely

and with malice and the intent to injure; (3) induced a third party or parties not to

enter into or continue a business relationship with the plaintiff; and (4) caused the

plaintiff some financial injury." <u>Vito v. Inman</u>, 286 Ga.App. 646, 649, 649 S.E.2d 753, 757 (2007).

The Court finds that Ziehm is entitled to summary judgment on Hoes' tortious interference claim.  In his affidavit, Hoes states as follows:  "After my termination from employment with Ziehm, several potential customers for Surgical Connections, Inc. have informed me that they could not do business with me or they would lose their vendor status with Ziehm.  This included Virtual Imaging in Florida." (Doc. 51-3, pp. 2-3).  Hoes testified in his deposition that he was told by Richard Spaed of Virtual Imaging that Delton Hyatt, former CEO of Ziehm, contacted the company and said that if it did any business with Hoes or Surgical Connections, Virtual Imaging would lose its vending license with Ziehm.  (Hoes depo., Vol. 1, pp. 123-124).

Defendants' evidence of Ziehm's alleged improper comments to Virtual Imaging and other potential customers is entirely hearsay in nature.  "In summary judgment proceedings[,] the rules on admissibility of evidence apply, and hearsay has no probative value unless it is part of the res gestae or otherwise admissible." <u>Hodges v. Putzel Elec. Contractors</u>, 260 Ga.App. 590, 594(1), 580 S.E.2d 243 (2003).  All Defendants have presented to the Court is self-serving hearsay, which "has no probative value on summary judgment." <u>Kirkland v. Tamplin</u>, 285 Ga.App. 241, 244, 645 S.E.2d 653 (2007) (quoting <u>Adams v. Gay</u>, 270 Ga.App. 65, 66(1), 606 S.E.2d 26 (2004).  Had Defendants submitted an affidavit from one of the potential customers who was allegedly contacted by Ziehm, the Court's finding might

be different.  As the record stands now, however, the only evidence of the allegedly wrongful actions of Ziehm is inadmissible hearsay.[9]  Ziehm is entitled to summary judgment on Count IV of Defendants' Counterclaim.[10]

### 4.    Attorney's fees and costs of litigation

As the Court has allowed part of Defendants' Counterclaim to move forward for consideration by a jury, Ziehm's Motion for Partial Summary Judgment on Count V of Defendants' Counterclaim is denied.

## IV.    CONCLUSION

The Court **GRANTS** Ziehm's Motion for Partial Summary Judgment on Count II of its Amended Complaint and Counts II, III, and IV of Defendants' Counterclaim. The Court **DENIES** Ziehm's Motion for Partial Summary Judgment on its claim for damages, and on Counts I and V of Defendants' Counterclaim.

─────────────────────

[9]Hoes also testified that Ziehm representatives made derogatory comments about Defendants to other potential customers, but Hoes could not definitively state the names of the people who allegedly made the comments, who the comments were made to, or who told Hoes about the comments.

[10]Defendants' claim also fails because they have produced no evidence that Ziehm's actions induced Virtual Imaging or any other third party not to enter into a business relationship with Defendants.  There is no evidence that Virtual Imaging told Hoes that the company could not or would not hire the Defendants, or that they would have hired the Defendants absent Ziehm's alleged actions.  No direct evidence showing that Ziehm's actions actually caused Defendants to lose business has been presented.  Evidence that only allows the jury to speculate that a business relationship was likely to develop is insufficient to establish a tortious interference claim.  Camp v. Eichelkraut, 246 Ga.App. 275, 283, 539 S.E.2d 588 (2000).

**SO ORDERED**, this the 2nd day of June, 2009.


_s/  Hugh Lawson_
**HUGH LAWSON, SENIOR JUDGE**

mbh